Steve Maezes and Emilia Maezes, Appellees, v. City of Chicago et al., Appellants.

Gen. No. 41,890.

Heard in the third division of this court for the first district at the October term, 1941. Opinion filed December 9, 1942.

BARNET HODES, Corporation Counsel, for certain appellant; JAMES A. VELDE, WILLIAM J. LANCASTER and L. LOUIS KARTON, Assistant Corporation Counsel, of counsel.

ERNST BUEHLER, LOUIS L. FISHER and RICHARD R. MLADIC, all of Chicago, for certain other appellant.

BECKMAN, HEALY, REID & HOUGH, of Chicago, for certain other appellant.

Urion, Bishop & Sladkey and Aaron R. Eppstein, all of Chicago, for appellees; Howard F. Bishop and Robert F. Dewey, both of Chicago, of counsel.

Mr. Presiding Justice Burke delivered the opinion of the court.

On November 13, 1936 Steve Maezes and Emilia Maezes filed a complaint in the circuit court of Cook county against the City of Chicago, a municipal corporation, the Sanitary District of Chicago, a municipal corporation, William J. Newman Company, a corporation, Peoples Gas Light & Coke Company, a corporation, and Ready Coal & Construction Company, a corporation. On October 27, 1938, pursuant to a stipulation, William J. Newman Company, a corporation, was dismissed and on the same day a one count amended complaint, which superseded the original complaint, was filed. The amended complaint charges the defendants with negligence in the construction of an intercepting sewer, in that while the sewer was being constructed in Jefferson street in Chicago, near plaintiffs' premises, the work was so negligently carried on that the soil there settled, slipped, collapsed and caved in, by reason whereof the soil supporting plaintiffs' building settled and as a proximate result the building and premises were damaged. Answers were filed by all defendants denying negligence, injury or damage. On November 4, 1939 there was filed an amendment as additional counts to the amended complaint. This consisted of three additional counts captioned Counts II, III and IV. In the three additional counts the charges of negligence were omitted and in none of them was there any charge against the Ready Coal & Construction Company. In Count II the allegations and charges are directed solely against the City of Chicago; in Count III, solely against the Sanitary District of Chicago, and in Count IV against the City of Chicago and the Sanitary District combined.

The theory of all three of these counts is the right to damages for injury to property resulting from the construction of a public improvement, that is, damages resulting from the exercise of the right of eminent domain. The substance of the charges is that, without any claim of negligence, the City of Chicago and the Sanitary District by the excavating, tunneling and construction work done by them or under their supervision and control, or their authorization and consent, on and below the surface of the named streets, impaired and destroyed the sewer, water and other facilities, utilities, conduits and piping, serving and connecting with plaintiffs' property and caused the buildings on plaintiffs' property to crack, settle, etc.; that the result of said work is the taking *pro tanto* and the permanent damaging of plaintiffs' property without their consent unless full and complete compensation for such taking and damaging is ascertained and paid, according to law and as provided by statute and the constitution; that such action is the taking and damaging of plaintiffs' property in violation of the constitutional provision respecting eminent domain. The city and the Sanitary District filed answers, but as the Ready Coal & Construction Company was not named in the additional counts, no answer was filed by it. After the case went to trial and at the close of plaintiffs' evidence, over the Ready Company's objections, the court allowed plaintiffs to file an amendment to the amended complaint by adding additional Count V. In this plaintiffs charge that the Ready Company was liable for damages on the theories charged in Counts II, III and IV against the City of Chicago and the Sanitary District because of a provision in the contract between the Ready Company and the Sanitary District, which they claim bound the Ready Company for the payment of such damages. On motion of the plaintiffs the cause was dismissed as to the Peoples Gas Light & Coke Company. A trial

before the court and a jury resulted in a verdict and judgment for the plaintiffs and against the three remaining defendants in the sum of $4,000, to reverse which this appeal is prosecuted.

Plaintiffs' theory is that their property has been damaged for public use within the meaning of section 13, Article II of the Illinois Constitution; that the Sanitary District, the municipal corporation performing the public work resulting in the damage, is liable because of the constitutional provision and also because of section 19 of the Sanitary District Act (sec. 339, ch. 42, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 122.128]); that the City of Chicago, having jurisdiction and control over the streets, is liable because it authorized and permitted, by ordinance, the doing of the work in the street; that the Ready Company is liable because of the provisions of its contract with the Sanitary District assuming liability; and that all of the defendants are liable because the work done was intrinsically dangerous. The theory of the Sanitary District of Chicago is that it is not liable for any damages resulting from the execution of the work in the construction of a tunnel by the contractor, under the theory of eminent domain; that a distinction should be made between the execution of the work and the completed project, in other words, that this is not the type of damage intended to be covered by section 13, Article II, of the Constitution of 1870; that even if the damages claimed were covered by the constitution, the contractor, Ready Company, would become liable since it would then be exercising the Sanitary District's power of eminent domain; that the contractor would further become liable under the indemnifying clause of the contract (Article 20); that the measure of damages is immaterial in so far as the contractor is concerned, since the action is not alone a direct action against it, but also as a result of its agreement to keep and hold the Sanitary District

harmless; that the amount of the judgment, no matter how ascertained, should be assessed against the contractor; that the evidence does not show a causal connection between the injuries complained of and the acts of the Sanitary District; that plaintiffs' evidence of damages was improper and misleading, resulting in a verdict for an excessive amount; that notwithstanding that the negligence theory was withdrawn by reason of the instructions given and refused, the form of the verdict, and the refusal to give separate forms of verdict, the case went to the jury as though the question of negligence was in issue and the jury was instructed in such a manner that it had no alternative except to find for the plaintiffs. The theory of the contractor is that in constructing a public improvement it is not liable for damages to adjoining property resulting therefrom or the construction thereof, unless injury and damage are the result of the contractor's negligence; that the provision of the contract between the Sanitary District and the contractor does not make the contractor liable; that this provision has no application to damages or injury resulting from the exercise of eminent domain, and only applies to acts of omission or commission by the contractor itself for which it would be liable; that in any event the measure of damages of which the Ready Company would be liable, if liable at all, would be the cost of repairing and replacing the injury to the buildings and not the difference in value of land and buildings before and after the improvement; that the evidence does not show a causal connection between the injuries complained of and the acts of the Ready Company; that plaintiffs' evidence of damages was improper and misleading, resulting in a verdict for an excessive amount; that notwithstanding that the negligence theory was withdrawn by reason of the instructions given and those refused, the form of verdict, and the refusal to give separate forms of verdict, the case

went to the jury as though the question of negligence was in the case, and the jury was instructed in such a manner that it had no alternative except to find for the plaintiffs; that so far as the record shows, the injury and damage, if any, could have been caused by some independent act of someone and was not the result of the construction of the improvement itself, in which case recovery could only be had against the person at fault. The theory of the City of Chicago is that its grant of an easement in certain city streets to the Sanitary District for an intercepting sewer as part of the Sanitary District's system of sewers is not an exercise by the City of Chicago of its right of eminent domain; and that the Sanitary District's use of the streets does not render the City of Chicago liable under section 13 of Article II of the Illinois Constitution for any damages resulting from the construction by the Sanitary District of a public improvement.

On October 14, 1927 the City of Chicago enacted an ordinance granting to the Sanitary District of Chicago an easement in certain designated streets in the city. The ordinance gave to the Sanitary District permission to "construct, reconstruct, repair, maintain and operate an intercepting sewer, drain and outlet, together with all appurtenances, hereinafter designated as 'intercepting sewer,' the same to be an adjunct of an addition to the Main Channel and West Side Sewage Treatment Works of the Sanitary District of Chicago." The Sanitary District entered into a contract for the construction of the sewer with William J. Newman Company. This contract was subsequently assigned to the defendant, Ready Coal & Construction Company, which assumed all the obligations thereof. The construction of the sewer began at 16th and Jefferson streets, and the shaft was located there. Jefferson street is a north and south and 16th an east and west, street. From the shaft the work proceeded

north and south. This case is concerned with the south heading, which started at the shaft, went south on Jefferson street to Canalport avenue, turned into Canalport avenue from Jefferson street and ran in a southwesterly direction on Canalport avenue to 22nd street. The top of the sewer was 16½ feet below the surface of the street and the sewer was 20 feet 5 inches high and 21 feet 8 inches wide. This sewer was constructed as a tunnel and as excavation proceeded the soil on top and around the excavation was supported with steel liner plates, which in turn were supported from a needle beam. The digging was done by hand with clay knives. On November 12, 1934, between 8:30 and 9:00 a. m., men were working in the tunnel where it approached Canalport avenue. The air began leaking through the street pavement on Jefferson street about 6 or 8 feet east of the curb at Canalport and Jefferson. This continued for about 5 minutes, when the pavement caved in. At the time of the cave-in the excavation of the tunnel had reached the north curb line at Canalport avenue. Plaintiffs owned the real estate at the southwest corner of Jefferson street and Canalport avenue, improved with a two-story brick building in the front and a two-story frame building in the rear. The nearest point of plaintiffs' buildings was 90 feet from the closest point of the cave-in. Between the point of the hole formed by the cave-in and the premises there was solid earth, after as well as before the cave-in. The brick pavement of Canalport avenue remained intact and the earth there was solid. There were two city water mains located where the cave-in occurred, a 6-inch and a 16-inch main. The 6-inch main was put in there in the 1870's or early 1880's, and Jefferson street was first paved in 1889 or 1890. The 16-inch main was constructed in 1933 or 1934. The 6-inch main was on the west side of Jefferson street at about the place where the air was coming through. The 16-inch main was on

the east side of the street. The 6-inch main was old
and rotten. The work in the tunnel was being done
under air pressure of 6 to 7 pounds to the foot. The
men were working in the tunnel excavating, bracing,
placing the plates and concreting. They would tunnel
about 20 feet and follow this with concrete. When
the street caved in it was found that the 6-inch main
was broken and that the water therefrom was pour-
ing into the tunnel. Whether it had been broken be-
fore or broke at the time of the cave-in does not ap-
pear. Water continued to, flow from the 6-inch main
into the hole and 15 minutes after the cave-in the hole
extended to the bottom of the tunnel excavation, which
was about 37 feet below the surface of the street. The
16½ feet of soil from the surface of the street down
to the top of the tunnel excavation fell to the floor of
the tunnel. The 16-inch main went down about a half
hour after the cave-in and the water therefrom poured
into the tunnel. The hole filled up with water in about
an hour's time and then the water overflowed into
the street. The flow continued for about 2 hours, when
the water was shut off by the city. This overflow ex-
tended from the street and went down to Canalport
avenue and Jefferson street. As soon as the main
was turned off, natural drainage through the sewers
took the water off the street. The water was pumped
out of the cave-in. Inside of 12 hours the water had
gone down 16 or 18 feet in the hole itself. Within 2
days they started to sheathe and brace the hole so that
they could go down and continue with the construction
of the sewer. At the height of the overflow, the water
was about 6 inches deep in the street right at the hole,
and leveled off so that half a block away there was no
water. Within 2½ hours the water had disappeared
from the streets. Twenty-four hours after the cave-
in an inspection disclosed there was no disturbance
to the surface of Canalport avenue, or to the brick
work, or to the street car tracks or the ground under-

neath. After the cave-in, the ground extending from the northeast curb of Canalport and Jefferson was intact, and the soil between the top of the excavation and the surface of the street, throughout the 90 feet between the hole and plaintiffs' premises, was intact and had not been disturbed when the tunnel was started again on January 29, 1935. On May 6, 1935 the work had progressed to 600 feet west of Canalport and Jefferson. The point at which work started on January 29th was Canalport and Jefferson in front of plaintiffs' premises. The sewer was completed March 2, 1936.

Plaintiffs' building, as well as others there, had basements below the street surface. The floor of plaintiffs' basement was 7 feet 8 inches below the level of the street surface. As a consequence, when the water flowing down Jefferson street reached plaintiffs' premises it flowed into the basement. Around 4 o'clock in the afternoon there was something like 3 feet of water in the basement, but as soon as the water was controlled this started to go down. The water stopped running on the street about 1 or 2 hours after the accident, thus no further water flowed into the basement from the street thereafter, and the water in the basement lowered through by drainage. The day after the accident most of the water was pumped out of the basement. Some water was there and pumping continued until April or May 1935, but at such a level that by placing planks on the floor a person could walk in the basement above the water. Mr. Walling, division superintendent of the Chicago Surface Lines, testified that 4 months after the cave-in the street car tracks had to be raised 6 to 8 inches before service was resumed. No evidence was offered by plaintiffs to show any causal connection with the cave-in and the injury or damage to the property. Two witnesses testified on that point for defendants. Dr. Thomas C. Poulter, an engineer and physicist, testified that he

had charge of the scientific program of the Second Byrd Antarctic Expedition; that he experimented with explosions and vibratory effects; that he had studied transmission of vibrations a great deal in soil, rock, water, ice and snow; the effect of explosions in producing those vibrations, and that he had done a great deal of work in soil mechanics, which is the study of the behavior of soils under various physical conditions; and that he did experimental work in connection with the effect of water or moisture upon surrounding territory. He estimated that the amount of soil that caved in was in the neighborhood of a million pounds. He stated that any vibration to a building as far away as plaintiffs' would be very slight; that if a mass of soil of this kind as it falls in takes place over a period of seconds, that disturbance, or any vibration that is set up, travels out at the rate of about a mile a second, so that the energy is dissipated over an enormous area very rapidly. The testimony of many lay witnesses who were familiar with the property shows that shortly after the construction of the sewer many structural cracks appeared in the foundation walls; that doors and windows, which previously · had opened freely, jammed and stuck; that the plaster walls throughout the building had cracked and in many places fallen; and that the floors, previously level, were out of plumb. All of this happened shortly after the doing of the work in the adjoining street. The work done involved the removal of large areas of soil in the construction of the tunnel. It is undisputed that the tunnel, when extended to Canalport avenue past plaintiffs' property, was within 10 feet of the north edge of plaintiffs' building. It is admitted by witnesses for the defendants that the construction of the sewer or tunnel caused material settlement of the street and sidewalks adjoining plaintiffs' property.

Each defendant has filed separate briefs. The Ready Company contends that a contractor construct-

ing a public improvement is not liable for damage to property, unless the damage is due to its fault. The Sanitary District maintains that the construction company, being an independent contractor, is liable for damage to property resulting from the execution of the work. Both the plaintiffs and the Sanitary District contend that under the provisions of Article 20 of the contract between the Ready Company and the Sanitary District, the Ready Company is bound to pay all of the damages. We will first consider the contention of the Ready Company that a contractor constructing a public improvement is not liable for damage to property unless the damage is due to its fault. We have carefully read and analyzed the cases cited on this proposition. Plaintiffs seek what is known as consequential damages. This term is applied to damages to or the destruction of property not actually taken. Prior to the Constitution of 1870 there could be no recovery for damage to private property. In the case of *Rigney v. City of Chicago,* 102 Ill. 64, our Supreme Court decided that the amendment to the constitution that ''private property shall not be taken or damaged for public use without just compensation'' afforded a remedy to property that was damaged. The right to damages where the property is not taken is based on the same constitutional provision as the right to just compensation where property is taken. The tunnel was being constructed in a public street by the Sanitary District under the authority conferred upon it by the statutes. If plaintiffs' property were taken by the Sanitary District there could be no question that the Sanitary District alone would have to pay the just compensation. It is obvious that the damage to plaintiffs' property was caused by the construction of the tunnel. The tunnel was being constructed by the Sanitary District in fulfillment of its duties. As the construction of the tunnel was for the benefit of the Sanitary District and its taxpayers, con-

sequential damages caused by such construction should be borne by the Sanitary District. It will be recalled that in this case the charges of negligence were abandoned and that plaintiffs are relying on the constitutional provision. The contractor is not charged with any negligence in the construction of the tunnel. Apparently, this contractor did the work in accordance with the plans and exercised due skill. In the case of *People ex rel. Tyson v. Kelly,* 379 Ill. 297, 301 (in discussing the case of *People ex rel. First Nat. Bank v. Kingery,* 369 Ill. 289) the court said: "Of course the director could not be required to personally respond in damages." This language recognizes that the municipal corporation damaging property is the one which should be required to respond in damages. The case of *Nelson v. McKenzie-Hague Co.,* 192 Minn. 180, involved the construction of a bridge and the consequent damages due to vibrations through the use of dynamite. The court says that State highways are built by the State in its capacity as a sovereign and their construction is not merely authorized; it is directed. The court continues:

"The highway commissioner is the agent of the State for that purpose. Mandatory is his duty to construct roads and the bridges necessary to make them complete. Once he has contracted for their construction, it is the legal duty of the contractor to perform his contract. Such a contract makes the contractor the agent of the State and clothes him with something more than mere authority to proceed. It puts upon him the legal duty to do so. How, then, so long as he is guilty of no negligence or trespass does he commit a legal wrong in performing, in the only way it can be performed, the affirmative duty he owes the State?

"If perchance, doing the work in the only way it can be done results in consequential damage to third persons, there is of course fault—a misfeasance. But it is that of the State in not providing compensation for

the damage before instituting the work. The making of such compensation is not the duty of the contractor. Upon what basis, then, can we hold him liable in damages for an obligation which neither legally nor morally is his, but is solely that of the sovereign State?

"If the contractor in such case is to be held liable for consequential damages, it must follow irresistibly, that the highway commissioner is equally so. . . . It is well settled that an officer charged with the performance of such duties . . . is not personally liable . . . for acts done within the scope of his authority unless it appears that the particular acts complained of were not only unnecessary, but were done corruptly or maliciously. . . . That does not exclude liability for an independent wrong such as negligence or trespass. . . . But no such tort is now charged against the present defendant who was proceeding with the performance of a lawful contract, an obligation to the sovereign State lawfully imposed upon it."

To the same effect are the cases of *DeBaker v. Southern Cal. Ry. Co.*, 106 Cal. 257; *Eachus v. Los Angeles Consolidated Electric Ry. Co.*, 103 Cal. 614; *Eachus v. City of Los Angeles*, 130 Cal. 492; *Atwater v. Trustees of Village of Canandaigua*, 124 N. Y. 602. In *Daegling v. Gilmore*, 49 Ill. 248, an action brought by appellee against appellant, who was employed by one Schwartz to erect the walls of a brick building near appellee's premises, it appears that while the building was in process of erection it was blown down, fell upon appellee's house and crushed it, destroying his household property, killing his wife and child, and injuring himself and niece. The court said (249):

"It is urged, that appellant was not liable for inherent defects in the plan of the building furnished by the architect. In this, as in all other actions, a recovery cannot be had except for some neglect or violation of

duty imposed by the law. As a general rule, one person is not responsible for the acts or omissions of another. It is, however, true, that there are certain relations, which, when they exist between parties, render one person liable for the acts or defaults of others, as in case of master and servant, and principal and agent, and in some other cases, where the doctrine of *respondeat superior* is applied. But in this case none of these relations appear to have existed. Appellant was the contractor to perform the work, under the direction of the architect as the agent of the owner of the lot; and hence, appellant cannot by any known rule of law, be rendered liable for the acts of either the architect or the owner.

"Appellant had no right or power to control the acts of either and to hold him liable for them would be to reverse the rule and require the inferior to answer for the acts of the superior, or his principal—to render the servant liable for the acts of his master, and the agent for those of his principal."

Our view is that the contractor, not being charged with any neglect in constructing the sewer, is not liable for the damage to the property unless it can be held under the provisions of Article 20 of the contract, which reads:

"The contractor covenants and agrees to pay all damages for injury to real or personal property, or for any injury sustained by any person growing out of any act or deed of the contractor, or his employees, that is in the nature of a legal liability, and he hereby agrees to indemnify and save the Sanitary District harmless against all suits and actions of every name and description brought against the Sanitary District for, or on account of any such injuries to real or personal property, or injuries received or sustained by any person or persons, caused by said contractor, his servants, agents or employees, in the execution of said work;

or by or in consequence of any negligence in guarding the same; or by or on account of any omission or act of the contractor, his agents or employees; that the said contractor further agrees that so much of the money due him under and by virtue of this contract, as shall be considered necessary by the Board of Trustees of the Sanitary District, may be retained by the Sanitary District to protect itself against loss until such suit or claim for damages shall have been settled, and evidence to that effect shall have been furnished to the satisfaction of the Board of Trustees.''

Both the plaintiff and the Sanitary District argue that Article 20 binds the contractor to pay the damages claimed by plaintiff. We have held that the contractor is not obliged to pay the damages under the constitutional provision. We are now asked to decide whether the contractor is obligated to pay the damages by virtue of its contract with the Sanitary District. It (the contractor) is not charged with, nor does the evidence show it to be guilty of, any negligence. We agree with the contentions of the contractor that it is not liable under the contract to pay the damages occasioned by the construction of the sewer, where, as here, it exercised due care and skill in performing the contract. We agree with the contractor that under the language of the contract the construction of the sewer was not its act or deed, that there was no liability on its part, and that the injury was not the result of the execution of the work. The injury suffered by plaintiff was the consequence of the performance of the work undertaken by the Sanitary District.

The Sanitary District maintains that as the work was done by an independent contractor, it is not liable. The construction of the intercepting sewer was done by the Sanitary District pursuant to the corporate powers vested in it by the statutes of the State of Illinois. In *City of Chicago v. Murdock*, 212 Ill. 9, the city sought to escape liability for damage done to property

as the result of the construction of a water tunnel upon the theory that the work was done by an independent contractor and therefore the doctrine of *respondeat superior* did not apply. The Supreme Court held that where the work was done by virtue of the corporate powers of the city, it was liable for damage done to private property regardless of the intervention of an independent contractor. We are satisfied that the Sanitary District is not relieved of liability because an independent contractor constructed the sewer. The Sanitary District also urges that if plaintiffs' property was injured as a result of the cave-in, which in turn resulted from negligence in the execution of the construction work, only the person whose negligent act caused or contributed to the injury is liable, and the action is in tort. The Sanitary District also contends that recovery can only be had under the constitutional provision where the injury is the necessary and unavoidable consequence of the improvement. The work done required the removal of large areas of soil in the construction of the tunnel. The tunnel, when extended in Canalport avenue beyond plaintiffs' property, was within 10 feet of the north edge of their building. In our opinion the evidence amply supports a finding that the construction of the tunnel damaged plaintiffs' property. The amount awarded by the jury apparently was reasonable.

The city contends that it is not liable under section 13 of Article II of the Constitution for damage to plaintiffs' property in view of the undisputed evidence that the improvement was made by the Sanitary District of Chicago. Plaintiffs contend that in permitting and authorizing public work to be done in the streets by ordinance, the city is liable for all damages resulting, even though it did not itself perform the work. The construction of the sewer was a Sanitary District improvement and not a public improvement of the City of Chicago. The city had no power to acquire or to

construct an adjunct or auxiliary to a channel of the Sanitary District. (*Sanitary Dist. of Chicago v. Commonwealth Edison Co.,* 357 Ill. 255.) The right of the city was limited to the granting of an easement to the Sanitary District to use the city streets for the construction of the sewer. When the Sanitary District, by appropriate ordinance, undertook to construct the intercepting sewer in Jefferson street, Canalport avenue and other streets, the City of Chicago could either voluntarily grant to the Sanitary District an easement to use the streets involved in the improvement, or could have waited until the Sanitary District condemned the city street under its statutory power of eminent domain. The city chose to grant the necessary easement. We agree that it did not thereby assume any obligation under the constitution to pay for any damages occasioned by reason of the construction of the sewer. Plaintiffs' property was not damaged for public use by the city. The doctrine of intrinsic danger is not applicable to this case. That is a doctrine of tort liability. We have read the cases cited by plaintiffs in support of their contention as to the city's liablity. No useful purpose will be served by analyzing them. Such cases involve liabilities in tort. The point raised here was not urged in such cases, nor were there other distinguishing features. We also agree with the city that the mere requirement that the work was to be done by the Sanitary District so as not unduly to injure existing facilities in the street, does not make the intercepting sewer a city project. The city owed a duty to its citizens to take care that the interference with city facilities should be kept at a minimum. We are firmly of the opinion that under the circumstances presented here the City of Chicago is not liable.

The Sanitary District also urges that the court erred in refusing to instruct the jury to find it not guilty of negligence as charged in the amended com-

plaint, and in refusing to instruct the jury to find for it at the close of plaintiffs' evidence and at the close of all the evidence. The court did not err in refusing to instruct the jury to find it not guilty of negligence for the reason that the charge of negligence was withdrawn. In our opinion the court rightfully decided not to direct a verdict for the Sanitary District as there was ample evidence for the jury to warrant the verdict against the Sanitary District.

Because of the views expressed the judgment of the circuit court of Cook county is affirmed as to the Sanitary District of Chicago, a municipal corporation, and reversed as to the City of Chicago, a municipal corporation, and the Ready Coal & Construction Company, a corporation, and judgment is entered here for costs for the City of Chicago, a municipal corporation, and the Ready Coal & Construction Company, a corporation, and against plaintiffs.

*Affirmed in part and reversed in part.*

HEBEL and KILEY, JJ., concur.